

THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: July 14, 2016

Beth E. Hanan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Casey John Zaidel and                     Case No. 15-27551-beh
    Mandee Maree Zaidel,

               Debtors.                   Chapter 7

Mary Holton,

               Plaintiff,

    v.                                      Adversary No. 15-2450

Casey John Zaidel et al.,

               Defendants.

**MEMORANDUM DECISION AND ORDER**

        Plaintiff Mary Holton seeks a determination that a debt owed her by Casey and Mandee Zaidel for replacement of her septic system is nondischargeable under 11 U.S.C. § 523(a)(2). She alleges the Zaidels wrongfully and intentionally misrepresented the non-compliant status of the septic system when selling their home to Ms. Holton. The Zaidels dispute the existence of the debt and in any event contend that it may be discharged in their chapter 7 bankruptcy case.

For the reasons that follow, the court finds that the Zaidels did not know that they made a false representation and lacked an intent to deceive Ms. Holton and, therefore, holds that their alleged debt to Ms. Holton is dischargeable under 11 U.S.C. § 523(a)(2)(A).[1]

I. **Jurisdiction**

The parties agree that the court has jurisdiction to decide this matter, based on the general order of reference entered by the United States District Court for this District and pursuant to the provisions of 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(1). This matter was tried to the court on March 18, 2016, and after post-trial review of four deposition transcripts, fourteen exhibits and written closing statements, the court took the matter under advisement. Attorney Aaron Ninneman appeared on behalf of Ms. Holton and Attorney Larry Vesely appeared on behalf of the Zaidels. The following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

II. **Procedural History**

On April 25, 2014, buyer Mary Holton sued the debtor-sellers Casey and Mandee Zaidel in Oconto County Circuit Court, asserting claims for breach of contract/warranty, intentional deceit/misrepresentation, and strict responsibility misrepresentation. The state court action was set for trial on June 30, 2015. On June 26, 2015, the Zaidels filed a chapter 7 bankruptcy petition.

Ms. Holton subsequently filed this adversary proceeding, seeking a determination that the Zaidels owe her a non-dischargeable debt of $12,187.00 under 11 U.S.C. § 523(a)(2)(A), for replacement of her septic system. Ms. Holton alleges that the Zaidels deceived her into purchasing a home from them by

---

[1] The court's decision addresses only the dischargeability issues governed by federal law. Because the court finds that the alleged debt is dischargeable, regardless of the amount, it need not determine any remaining issues of state law, such as liability or the amount of damages, if any. *See, e.g., In re Catalanotto*, 366 B.R. 566, 568 (Bankr. E.D. La. 2007) (finding it unnecessary to determine "whether a debt exists or the amount of that debt," after concluding that any alleged debt owed to the plaintiff was dischargeable).

concealing the fact that the home's septic system needed to be replaced. The Zaidels list an unsecured debt owed to Ms. Holton in that amount, but describe the debt as "disputed," and assert that the alleged debt is dischargeable in any event. *See* Case No. 15-27551, CM-ECF, Doc. No. 1, at 17; Adversary Case No. 15-02450, CM-ECF, Doc. No. 37.

### III. Factual Findings

The parties did not stipulate to any facts. The following constitutes the court's finding of facts based on the testimony of five live witnesses: Mandee and Casey Zaidel, Mary Holton, Julie Johnson and Kevin Brehmer. The court also considered deposition testimony of four additional witnesses—Tina Owens, Nicole Willems, Casey Filz and George Chambers—and fourteen exhibits.

#### A. Offer to Purchase Negotiations

In August 2012, the Zaidels listed their Pulaski, Wisconsin home ("the Property") for sale through realtor Tina Owens. A Condition Report signed by the Zaidels at that time stated that the sellers were not aware of any defects in the septic system (Exhibit 2, item C.7). *See* CM-ECF, Doc. No. 32, at 28. In early 2013, the Zaidels received and accepted an offer to purchase the Property. That offer ultimately fell through during the first or second week of March, because, as Mrs. Zaidel testified, the potential buyers could not obtain financing. *See also* CM-ECF, Doc. No. 34, at 2.

Plaintiff Mary Holton toured the Property for the first time at the end of March 2013, and for a second time in early April 2013. On April 5, 2013, she submitted a purchase offer through her realtor, Nicole Willems (Exhibit 1). *See* CM-ECF, Doc. No. 32, at 11. The Addendum to the offer required the Zaidels to provide Ms. Holton, no later than 15 days prior to closing, "a current written report, including soil test data, if a soil test is required by county regulations . . . which indicates that the [septic system] is not disapproved for current use and complies with current county requirements for continued operation." *Id.*, at 24.

The Addendum further noted at lines 100–103: "Buyer should check with the county, the municipal sewer/water district, and evaluate the well and private sanitary system ordinances and codes for additional requirements that may apply to the Property if material to Buyer's decision to purchase." *Id.*, at 25.

Line 159 of the purchase offer states: "Seller represents to Buyer that as of the date of acceptance Seller has no notice or knowledge of Conditions Affecting the Property or Transaction (lines 64-114) other than those identified in Seller's Real Estate Condition Report dated August 3, 2012, which was received by Buyer prior to Buyer signing this Offer and which is made a part of this Offer by reference . . . ." *Id.*, at 5.

After a series of counter-offers, on April 9, 2013, the Zaidels accepted Ms. Holton's offer, which incorporated the septic system compliance contingency of the original offer. *Id.*, at 12–15.

### B. The First Septic System Inspection

In the Spring of 2013, plumber Casey Filz and soil tester Jeffrey Zahm conducted an inspection of the Zaidels' septic system, and the resulting inspection report found that the septic system did not meet code requirements. The parties disagree on the impetus for this first inspection (whether the Zaidels requested it because of Ms. Holton's offer or in response to a prior accepted offer), and the timing of the inspection (whether it was conducted before or after Ms. Holton presented her offer). The evidence on these two points conflicts:

- The inspection report completed by Mr. Filz and Mr. Zahm (the "Filz/Zahm Report," Exhibit 3) was signed and dated March 18, 2013 by Mr. Filz (which is before the date of Ms. Holton's April 5 purchase offer), and signed and dated April 11, 2013 by Mr. Zahm (after Ms. Holton's purchase offer). *See* CM-ECF, Doc. No. 32 at 30.

- Mr. Filz testified that he was contacted by someone—he assumed it was Mandee Zaidel—to conduct a septic system inspection on the Property, and that he went to the Property on or before March 18, 2013 to inspect the septic tank. He testified that he retained Mr. Zahm to conduct the soil reading portion of the inspection. Mr. Filz completed questions 2

through 8 on the report, and later Mr. Zahm completed questions 1 and 9. Mr. Filz stated that it was Mr. Zahm who made the ultimate determination of whether the Zaidels' septic system passed the inspection, because the results of soil readings determine whether a septic system meets code requirements.

- Mandee Zaidel testified that she contacted Jeffrey Zahm to inspect the septic system only after Ms. Holton presented her offer to purchase. (Recall that Ms. Holton's offer was dated April 5, 2013.) Mrs. Zaidel disputed the accuracy of the March 18 date next to Mr. Filz's signature on Exhibit 3.

- The weather was bad when Jeffrey Zahm came to the Zaidels' property to conduct his inspection, and Mrs. Zaidel asked him why he would conduct the test on an icy, rainy day.

- Mr. Zahm informed Mrs. Zaidel while he was on the Property that the septic system did not pass the inspection. Mrs. Zaidel stated that she received a copy of the Filz/Zahm Report in the mail about a week after Mr. Zahm was on the Property. The Zaidels provided a copy of the report to their realtor Ms. Owens, who in turn provided it to Ms. Willems. Ms. Willems shared it with her client Ms. Holton.

- Ms. Holton testified that she knew the Zaidels' septic system had failed a septic inspection prior to making an offer on the house, and that she first saw the Filz/Zahm Report during her first tour of the Property.

- Nicole Willems, realtor for Ms. Holton, testified that neither she nor Ms. Holton had received any septic inspection reports prior to Ms. Holton making her offer, but later Ms. Willems testified that she had received the Filz/Zahm Report prior to Ms. Holton's April 5, 2013 offer.

- Mrs. Zaidel testified she put all of the documentation she had about the Property out on the counter during real estate showings, including the failed septic system report. She also testified that her family never experienced any problem with the septic system.

Considering the various witness recollections, the court finds Mr. Filz's testimony about the timing of his portion of the septic system inspection to be the most credible, and finds no reason to doubt the accuracy of the dates on the Filz/Zahm Report.

### C. Events After the Failed Inspection

The next set of facts concern events after the failed inspection. Mandee Zaidel told her husband that the septic system did not pass the testing. Before

the Zaidels received a written copy of the Filz/Zahm Report, Casey Zaidel called the Oconto County Zoning Office. He spoke to Assistant Zoning Administrator Kevin Brehmer about the failed inspection. Mr. Zaidel wanted to know why Mr. Zahm would perform the test on such a wet day. During this call, most likely on April 15, 2013, Mr. Brehmer told Mr. Zaidel that the septic system must be replaced, although he said the need for replacement did not have to hold up the pending sale. Replacement could take place within the year, according to Mr. Brehmer. Mr. Zaidel relayed this information to his wife. Neither Mr. Brehmer nor Mr. Zaidel testified to discussing a possible second inspection.

The Zaidels' former neighbor, Julie Johnson, testified that Casey Zaidel told her at some point during the Spring of 2013 that his septic system needed to be replaced. There is no evidence that the Zaidels informed their realtor Ms. Owens of Mr. Brehmer's statement that the septic system must be replaced. Mr. Brehmer testified that he spoke with a realtor, whose name he could not recall, about the Property around the time he received the call from Mr. Zaidel.

Mr. Brehmer memorialized his conversation with Mr. Zaidel in an Enforcement Order dated April 16, 2013 (the "Enforcement Order," Exhibit 4). *See* CM-ECF, Doc. No. 32, at 32. In the order, Mr. Brehmer stated that the "Department expects a replacement [septic system] to be installed no later than November 1, 2013." Mr. Brehmer testified that he did not personally mail the Enforcement Order to the Zaidels, but per his office protocol, one of his secretaries would have mailed it at his direction. The order would not have been sent via certified mail. Mr. Brehmer said he then put the matter "on auto-pilot."

The Zaidels testified that they never received the mailed April 16, 2013 Enforcement Order. Both Zaidels testified that they experienced problems receiving mail when they lived on the Property (sometimes attributable to a snow plow knocking over their mailbox), while their former neighbor, Ms. Johnson, testified that she had never experienced such problems. Mr. Brehmer testified he had no file notes about the Enforcement Order being undeliverable.

According to Mrs. Zaidel, after she received the Filz/Zahm Report, she "thought that would be the end of [Mary Holton's] loan, . . . [that the Zaidels] wouldn't be able to sell the house." *See* CM-ECF, Doc. No. 39, at 44:50–45:00. She called her realtor, Tina Owens, who said she would relay this information to Ms. Holton's realtor, Nicole Willems. *See also* CM-ECF, Doc. No. 34, at 2. At some point Mrs. Zaidel arranged for another septic inspection to be conducted by plumber George Chambers in May 2013.

D.  **The Second Septic System Inspection**

The parties disagree over who initiated this second inspection: Mrs. Zaidel and Tina Owens testified that Nicole Willems asked if the Zaidels would be willing to get a second opinion, after the land had dried out, *see also id.*; Ms. Holton testified that she did not request the second inspection; and Ms. Willems testified that the Zaidels decided to get another inspection because they didn't believe that the first report was correct. These statements are not necessarily in conflict. And given Ms. Holton's testimony that she knew of the first, failed inspection and nonetheless made an offer contingent on the septic system being compliant with the local code, it is reasonable to conclude that Ms. Holton expected there would be a second inspection, if not also a replaced system.

Mr. Chambers conducted a septic system inspection on the Property in early May 2013. Mrs. Zaidel did not inform him that the septic system had failed an inspection a month earlier. Mr. Chambers testified he saw what appeared to be a soil bore "toward the creek" but Mrs. Zaidel told him it was something else. Mr. Chambers ultimately concluded that the septic system met code requirements (Exhibit 5, the "Chambers Report"). *See* CM-ECF, Doc. No. 32, at 33–34. On May 3, 2013, Mr. Chambers gave Mrs. Zaidel a copy of his inspection report, with an invoice stating that he would send a copy of the passing report to the Oconto County Zoning Office (Defendants' Exhibit 5). *See* CM-ECF, Doc. No. 30, at 33–35. Mrs. Zaidel sent a copy of the report to Ms.

Owens, who passed it on to Ms. Willems. Ms. Willems shared this second report with Ms. Holton, who accepted it.

The Zaidels testified that they believed the passing inspection report from Mr. Chambers meant that the septic system no longer needed to be replaced. Mr. Zaidel "thought [the] septic [system] was good to go, and [they] could proceed in the sale." *See* CM-ECF, Doc. No. 39, at 1:00:15–1:00:25. Mrs. Zaidel also testified that she believed Mr. Chambers sent a copy of his report to the Oconto County Zoning Office, as stated in his invoice, and as he told her he would do.[2] No one from the County Zoning Office contacted the Zaidels after Mr. Chambers purportedly mailed his report, nor did the Zaidels contact the county again.

The closing on the Property took place on June 7, 2013. Ms. Holton testified that no one showed her the April 16, 2013 Enforcement Order or told her the septic system needed to be replaced prior to her purchasing the Property, and that she would not have gone through with the transaction had she known that the septic system required replacement. There was no testimony that Ms. Holton took any other steps to assure herself that the septic system was code compliant, after receipt of the Chambers Report.

The septic system was not replaced by November 1, 2013, as required by the Enforcement Order. Ms. Holton first learned in late November 2013 that the septic system was under an Enforcement Order and had to be replaced. Ms. Holton ultimately arranged for a new septic system to be installed and paid $12,187.00 for that work (Exhibits 9–15). *See* CM-ECF, Doc. No. 32, at 41–47.

## IV. Discussion

Section 523(a)(2)(A) excepts from discharge "any debt . . . for money, property, services, . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ." To prevail on a claim under 11 U.S.C.

---

[2] Mr. Brehmer testified that he did not receive a copy of Mr. Chambers' report until at least November 2013, from Ms. Willems. He added that receipt of Mr. Chambers' passing inspection report would not have nullified the April 16, 2013 Enforcement Order.

§ 523(a)(2)(A), a creditor must prove: (1) that the debtor made a false representation or omission, which the debtor either knew was false or made with reckless disregard for the truth; (2) that the debtor possessed an intent to deceive or defraud; and (3) that the creditor justifiably relied on the false representation. *Reeves v. Davis* (*In re Davis*), 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg,* 599 F.3d 712, 716–17 (7th Cir. 2010); *In re Bero,* 110 F.3d 462, 465 (7th Cir. 1997). A transaction in property is sufficient to satisfy the definitional requirement of section 523(a)(2)(A). *See In re Sprague*, 205 B.R. 851, 857 (Bankr. N.D. Ohio 1997).

Under section 523(a)(2)(A), false pretenses include "implied misrepresentations or conduct intended to create or foster a false impression." *Memorial Hosp. v. Sarama* (*In re Sarama*), 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). False pretenses do not require overt misrepresentations. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* at 928. Thus, silence or concealment can constitute false pretenses. *In re Benton*, 540 B.R. 372, 377 (Bankr. E.D. Wis. 2015) (citing *Fosco v. Fosco* (*In re Fosco*), 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002)).

Similarly, although a false representation under section 523(a)(2)(A) "is an express misrepresentation," it can be demonstrated through conduct, and a spoken or written statement is not required. *In re Reed*, 542 B.R. 808, 827 (Bankr. N.D. Ill. 2015). In other words, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Id.* (internal quotation omitted). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *In re Ryan*, 408 B.R. 143, 157 (Bankr. N.D. Ill. 2009)*; see also Benton*, 540 B.R. at 379 (concluding that the debtor's calculated concealment of a material fact constituted a willful misrepresentation under 11 U.S.C. § 523(a)(2)(A)).

An intent to deceive may be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor. *In re Sarama*, 192 B.R. at 927. But, harkening back to the rule of construction that exceptions to discharge are construed strictly against the creditor, "if there is room for an inference of honest intent, the issue of intent must be resolved in favor of the debtor." *In re Trevisan*, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003) (citing *Rembert v. Citibank South Dakota, N.A.*, 219 B.R. 763, 767 (E.D. Mich. 1996), *aff'd*, 141 F.3d 277 (6th Cir. 1998)).

A creditor objecting to discharge bears the burden of proving each element of the discharge exception by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re Bero*, 110 F.3d at 465. It is well-settled that "'exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor.'" *Goldberg Securities, Inc. v. Scarlata* (*In re Scarlata*), 979 F.2d 521, 524 (7th Cir. 1992) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)); 11 U.S.C. § 727(a).

## A. Representations Made by the Zaidels

### 1. The Enforcement Order

Ms. Holton argues that the Zaidels made a false representation by failing to disclose either (1) the April 16, 2013 Enforcement Order or (2) the fact that the septic system needed to be replaced. For the court to find that the Zaidels failed to disclose the Enforcement Order, the court must first determine whether they actually received it.

The law presumes that a properly addressed, stamped, and mailed letter was delivered to its intended recipient. *See Hagner v. United States*, 285 U.S. 427, 430 (1932). The presumption of delivery arises upon either (1) evidence of actual mailing, such as testimony or an affidavit from the person who mailed the letter; or (2) "proof of procedures followed in the regular course of operations," which give rise to a strong inference that the letter was properly addressed and mailed. *Godfrey v. United States*, 997 F.2d 335, 338 (7th Cir. 1993). In this case, the evidence does not permit the court to infer that the

April 16, 2013 Enforcement Order was actually mailed. Mr. Brehmer testified that he directed his secretary to mail the Enforcement Order, but there is no direct testimony from his secretary to confirm the mailing. Nor is there any circumstantial evidence, such as testimony of regular business practices and procedures, to give rise to a strong inference that the letter was placed in an envelope, properly addressed, stamped, and mailed. *See, e.g., Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1340 (10th Cir. 1998) (plaintiff's testimony that her attorney mailed a letter was insufficient to raise the presumption of delivery, when there was no affidavit from the attorney or anyone in the attorney's office regarding the mailing, and no testimony regarding the customary mailing practices in the attorney's office that would permit an inference that the letter had sufficient postage and was mailed). Absent such evidence, the court cannot presume that the Enforcement Order was delivered to the Zaidels.

      The court therefore is left with only the sworn testimony of Mr. and Mrs. Zaidel that they never received the letter, the testimony of the Zaidels about their prior difficulties in receiving mail, and the testimony of their neighbor Ms. Johnson that she personally did not experience any mail-delivery problems. The court finds the Zaidels' testimony about snowplow mishaps irrelevant to whether they received a letter purportedly mailed in mid-April. The court also concludes that one neighbor's mail delivery experience should not be given great weight against the debtors' own experience, as the record is devoid of other evidence that would suggest the Zaidels' and Ms. Johnson's mail experiences ought to be the same, other than some proximity in their addresses. In all, because the presumption of delivery does not apply here and because the Zaidels acted promptly and honestly when they received the "bad news" of the Filz/Zahm Report, the court finds credible their testimony of non-receipt of the Enforcement Order. That reasoning, combined with the liberal construction canon applicable here, *In re Trevisan*, 300 B.R. at 717, leads the court to find that the Zaidels did not fail to disclose to Ms. Holton the April 16, 2013 Enforcement Order.

## 2. Mr. Zaidel's Conversation with Mr. Brehmer

The next question is whether Kevin Brehmer's verbal direction to Casey Zaidel on April 15 or 16, 2013 that the system had to be replaced was a material fact the Zaidels should have disclosed to Ms. Holton.

As previously noted, silence or concealment as to a material fact may constitute false pretenses or a false representation under section 523(a)(2)(A). *In re Fosco,* 289 B.R. at 86; *In re Reed,* 542 B.R. at 827; *see also Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1288 (8th Cir.1987) ("Bankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A).")

In *In re Van Horne*, the Eighth Circuit held that a borrower has a duty to disclose all material facts to the lender, meaning that the creditor has a right to "know those facts touching upon the essence of the transaction." *Id.*; *see also In re Sprague*, 205 B.R. 851, 859–61 (Bankr. N.D. Ohio 1997) (citing Ohio law). The Ninth Circuit has defined a material fact as one which a reasonable buyer might have considered "important in the making of th[e] decision" to purchase. *In re Apte,* 96 F.3d 1319, 1323 (9th Cir. 1996); *see also Candland v. Ins. Co. of North America* (*In re Candland* ), 90 F.3d 1466, 1470 (9th Cir.1996) (for purposes of § 523(a)(2)(B), a material fact is one that if revealed "would generally affect a lender's or guarantor's decision"). The *Apte* Court held "the nondisclosure of a material fact in the face of a duty to disclose" establishes the requisite reliance for actual fraud under the Bankruptcy Code. *Apte,* 96 F.3d at 1323. Distilling the standards from § 551 of the Restatement (Second) of Torts (1976), the court explained that a party to a transaction has a duty to disclose a hidden material fact when the other party has no suspicion of its existence and no opportunity to discover it. *Id.* at 1324.

Applying those principles, the court finds that Mr. Brehmer's statement to Casey Zaidel that the septic system needed to be replaced was a material fact. Ms. Holton testified that she would not have purchased the Property if she

had known that she would have to replace the septic system. Further, in April 2013, she specifically made her Offer to Purchase contingent on evidence that the septic system was operational and compliant with current county requirements. *See* Exhibit 1, CM-ECF, Doc. No. 32, at 24.

It is apparent that Casey Zaidel viewed Mr. Brehmer's statement seriously, as he disclosed the gist of that discussion to his neighbor, Ms. Johnson. According to Ms. Johnson, Mr. Zaidel told her his septic system would have to be replaced. But there is no evidence the Zaidels told anyone else involved in the home inspection and sale process about Mr. Zaidel's conversation with Mr. Brehmer. Thus they failed to disclose to Ms. Holton a material fact.

### B. Did the Zaidels Know Their Misrepresentation Was False?

The Zaidels' misrepresentation was permitting Ms. Holton to believe, at the time of closing on the Property, that the septic system complied with county ordinances. After reviewing all the evidence, the court concludes that the Zaidels did not know their representation was false, nor did they act with reckless disregard for the truth.

The Zaidels testified that they believed that the May 2013 Chambers Report, which gave their septic system a passing rating, meant that the septic system did not need to be replaced. The Zaidels may have thought the drier weather accounted for the passing grade from the Chambers Report. Mandee Zaidel also testified that she thought the county knew of the Chambers Report because Mr. Chambers' invoice indicated he had forwarded a copy to the county.[3] Mr. Brehmer testified that it was not his practice to follow up on Enforcement Orders—he put things "on auto-pilot" and trusted that individuals would hire plumbers and remedy whatever septic problems existed—and that he noticed that the septic system on the Property had not been replaced some months later because he happened to be in the area. There was no testimony

---

[3] Mr. Chambers testified that he doesn't get any receipt or stamped copy back after forwarding septic inspection reports to the county. *See* CM-ECF, Doc. No. 40, at 11.

that Mr. Brehmer had told Casey Zaidel, during their single phone call, that a second, passing inspection would not render the system code-compliant. The court accepts that the Zaidels did not receive the Enforcement Order in the mail. Taken together, these facts support the finding that the Zaidels did not know their misrepresentation was false.

The court also finds that the Zaidels likewise did not make the misrepresentation with a reckless disregard for the truth. This case differs from those where the defendant turns a blind eye to a material fact. For example, in a recent "bad check" case, the court concluded that the debtor's failure to question whether her unemployed boyfriend had funds in his checking account to cover her vehicle down payment—which the court described as an "ostrich defense"—satisfied the recklessness requirement for a willful misrepresentation under section 523(a)(2)(A). *In re Benton*, 540 B.R. 372, 378–79 (Bankr. E.D. Wis. 2015). The *Benton* debtor allowed her boyfriend to cause the car dealership to think the two were engaged and living together as a financially stable household, when in fact she knew he had not been working and was applying for disability, and she was moving out of their residence. The court concluded that the debtor should have disclosed to the dealership her boyfriend's true inability to make the down payment. *Id.* at 379.

Here, it cannot be said the Zaidels turned a blind eye to the need to replace the septic system, because they did not receive the Enforcement Order and they believed that the successful second inspection superseded the statement Mr. Brehmer made to Mr. Zaidel. And earlier, when they received the failing Filz/Zahm Report, the Zaidels disclosed that report to potential buyers including Ms. Holton.

    **C.    Did Ms. Holton Justifiably Rely on the Misrepresentation?**

Section 523(a)(2)(A) also requires that the creditor must have justifiably relied on the representation. Justifiable reliance is a less demanding standard than "reasonable reliance." *Field v. Mans*, 516 U.S. 59, 70–73 (1995). The standard is met where the plaintiff was justified in relying upon representations whose falsity, although ascertainable from some investigation,

are nevertheless not ascertainable to one of like knowledge and intelligence from a cursory glance or appearance of the Property. *Id.* at 71.

Ms. Holton maintains that she justifiably relied to her detriment on the Zaidels' representations: the information on the Real Estate Condition Report and on the Chambers Report. The Zaidels do not argue that Ms. Holton's reliance at the time of closing on the information they provided was unjustified. They make no argument, for instance, that under lines 100–103 of the Addendum to the Offer to Purchase, Ms. Holton herself should have checked further with the county, in light of the Filz/Zahm Report, to consider whether other county requirements came into play. *See* Exhibit 1, CM-ECF, Doc. No. 32, at 25.

The court finds that Ms. Holton's reliance on the Condition Report, and more so on the Chambers Report, absent her knowledge of the conversation between Casey Zaidel and Kevin Brehmer, to be justifiable. A cursory inspection of the Property would not have disclosed to Ms. Holton that the county required septic system replacement. While it might have been a "best practice" for Ms. Holton or her agent to follow up with the county about the inconsistencies between the Filz/Zahm Report and the Chambers Report, or even to contact Mr. Chambers directly about the differences, her failure to follow up does not render her reliance unjustified. She, like the Zaidels, apparently assumed that the positive Chambers Report was the last word on the passing condition of the septic system. Although it was not asked of her, Ms. Holton also may have assumed that the county actually received a copy of the Chambers Report, and that that the county accepted the report as proof of compliance when no county action ensued. The reliance element is satisfied.

### D.     Did the Zaidels Have an Intent to Deceive Ms. Holton?

Given that the Zaidels withheld a material fact, and that Ms. Holton justifiably relied on the misrepresentation, to prove her claim under section 523(a)(2)(A), Ms. Holton also would have to establish that the Zaidels withheld the information with the intent to deceive her. While the court already has found that the Zaidels did not know their representation was false, the court

takes up the intent analysis because it was the subject of significant argument by the parties.

A number of courts acknowledge the difficulty in establishing intent to misrepresent. "Since fraudulent intent rarely can be proven directly, '[i]t must be inferred from the surrounding circumstances.' If there is room for an inference of honest intent, the issue of intent must be resolved in favor of the debtor." *In re Trevisan*, 300 B.R. at 717 (internal citation omitted). Additionally, "[p]roof of intent for purposes of § 523(a)(2)(A) must be measured by a debtor's subjective intention *at the time of the transaction* in which the debtor obtained the money, property or services." *Id.* (emphasis added).

The same facts which demonstrate that the Zaidels lacked knowledge that the septic system did not comply with the county code at the time of the closing undergird the finding that they did not intend to deceive Ms. Holton as to the compliant nature of the septic system.

True, there is some evidence of an intent to withhold certain information—namely, Mr. Brehmer's statement that the septic system had to be replaced, and the failing Filz/Zahm Report—from Mr. Chambers.[4] But this evidence does not equate to an intent to deceive Ms. Holton. And Ms. Holton does not contend that the Zaidels had a duty to disclose to Mr. Chambers either the results of the Filz/Zahm inspection, or Mr. Zaidel's conversation with Mr. Brehmer about replacing the septic system.[5] Any concern that the court may have about the conversation between Mr. Chambers and Mrs. Zaidel is

---

[4] For example, Mr. Chambers asked questions that could have led Mrs. Zaidel to tell him about her husband's conversation with Mr. Brehmer, or at least about the Filz/Zahm Report. While at the Property, Mr. Chambers asked Mandee Zaidel about something that looked like a soil boring "toward the creek." According to Mr. Chambers, Mrs. Zaidel said it was not a soil test, but something else. *See* CM-ECF, Doc. No. 40, at 14. Neither counsel explored this conversation during Mrs. Zaidel's trial testimony. The Filz/Zahm Report does not identify whether the soil sample for that inspection was taken "by the creek" or elsewhere on the Property.

[5] Nor could there be a duty to disclose to Mr. Chambers that would form the basis for an intentional misrepresentation claim by Ms. Holton, because the claim here does not revolve around a transaction with Mr. Chambers and Mr. Chambers did not rely on Mrs. Zaidel's response to his detriment. *See Kaloti Enter., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶¶ 12, 20, 283 Wis. 2d 555, 699 N.W.2d 205.

resolved because there is no evidence Mrs. Zaidel knew what Mr. Chambers would have done, had he known that there had been a prior, failed septic system inspection.[6]

Ms. Holton argues that evidence of the Zaidels' intent to deceive her includes the fact that they needed the proceeds of the Property sale to fund construction of their new home, that they were motivated to close on the sale to Ms. Holton because a prior offer to purchase had fallen through, and that their failure to disclose Mr. Zaidel's conversation with Mr. Brehmer regarding replacement of the septic system stands in stark contrast to the Zaidels' practice of disclosing other information about the Property to prospective buyers and their realtors by placing that information on the kitchen counter.

The court finds that the Zaidels' need for funds to build their new home is not evidence of an intent to deceive. Mrs. Zaidel testified that her family lived with her parents for almost 18 months, from the time of the Property sale to the completion of their new home construction. These facts do not suggest an urgency to close the sale to Ms. Holton, and thus are not proof of intent to deceive. Nor is the fact that Ms. Holton's offer to purchase was the second such offer on this Property proof of an intent to deceive. If anything, it suggests that the Property was able to generate multiple offers well in advance of when the Zaidels moved into their new home. That evidence does not establish an intent to deceive. Ms. Holton's third argument—contrasting the withholding of the conversation with Mr. Brehmer with the Zaidel's provision of other Property-related information to potential buyers and realtors—raises more concern.

But consideration of those and other facts relieve that concern. The court considers that the Zaidels shared—and did not hide—negative information related to their property. They displayed at least a portion of the Filz/Zahm Report on their kitchen counter before Ms. Holton made her Offer to Purchase;

---

[6] Mr. Chambers testified that his passing report of the Zaidel septic system would not, by itself, replace an outstanding enforcement order issued by the county. *See* CM-ECF, Doc. No. 40, at 8. There is no evidence he made such a statement to either of the Zaidels.

Mr. Zaidel called Kevin Brehmer at the county the day after he received the written Filz/Zahm Report to discuss options; Mr. Zaidel freely discussed the failed report and need for replacement with his neighbor Julie Johnson some time before Mr. Chambers' inspection took place; once Mrs. Zaidel received the failing Filz/Zahm Report in mid-April 2013, she told her realtor she thought the "deal was dead." In addition, Mrs. Zaidel thought that Mr. Brehmer had received the passing Chambers Report and, via his silence, had accepted it as proof that the septic system was up to code. Mr. Zaidel thought "they were good to go."

Here, while there are inferences that Mrs. Zaidel intentionally did not tell George Chambers about the prior failed inspection, the stronger evidence and inferences therefrom are that the Zaidels were forthcoming about negative information concerning their Property, and reasonably believed that the verbal instruction from Mr. Brehmer to replace the system was superseded by the later, passing Chambers Report and lack of county objection to it. "If there is room for an inference of honest intent, the issue of intent must be resolved in favor of the debtor." *In re Trevisan*, 300 B.R. at 717.

**V. Conclusion**

Plaintiff Mary Holton was required to establish all five elements by a preponderance of the evidence, to prevail under section 523(a)(2)(A). The court finds that Ms. Holton has not sustained her burden with respect to the Zaidels' knowledge of the falsity of the representation and the element of intent.

Accordingly,

**IT IS HEREBY ORDERED** that the debt of the defendants to the plaintiff is dischargeable under 11 U.S.C. § 523.

**It is so ordered.**

# # # # #